Exhibit 2

# Exhibit 2

143 S.Ct. 2279
Supreme Court of the United States.

Gerald E. GROFF, Petitioner
v.
Louis DEJOY, Postmaster General

No. 22-174
|
Argued April 18, 2023
|
Decided June 29, 2023

**Synopsis**
**Background:** Former United States Postal Service (USPS) employee, an Evangelical Christian who believed for religious reasons that Sunday should be devoted to worship and rest, brought action against the Postmaster General under Title VII, alleging the Postal Service failed to make reasonable accommodations for his Sunday Sabbath practice and instead disciplined him for failing to work as a letter carrier on Sundays. The United States District Court for the Eastern District of Pennsylvania, Jeffrey L. Schmehl, J., 2021 WL 1264030, granted summary judgment to the Postmaster, and employee appealed. The United States Court of Appeals for the Third Circuit, Shwartz, Circuit Judge, 35 F.4th 162, affirmed. Certiorari was granted.

**[Holding:]** In a unanimous opinion, the Supreme Court, Justice Alito, held that to defend denial of a religious accommodation under Title VII, an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business; abrogating *Equal Employment Opportunity Commission v. Walmart Stores East, L.P.*, 992 F.3d 656; *Tagore v. U.S.*, 735 F.3d 324; *Wagner v. Saint Joseph's/Candler Health System, Inc.*, 2022 WL 905551; *Camara v. Epps Air Service, Inc.*, 292 F. Supp. 3d 1314; *El-Amin v. First Transit, Inc.*, 2005 WL 1118175; *E.E.O.C. v. Sambo's of Georgia, Inc.*, 530 F.Supp. 86.

Vacated and remanded.

Justice Sotomayor filed a concurring opinion, in which Justice Jackson joined.

West Headnotes (14)

**[1]** **Civil Rights** Practices prohibited or required in general; elements

Title VII does not demand mere neutrality with regard to religious practices but instead gives them favored treatment in order to ensure religious persons' full participation in the workforce. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2]** **Civil Rights** Accommodations

Showing more than a de minimis cost, as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII provision requiring employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

5 Cases that cite this headnote

**[3]** **Civil Rights** Accommodations

"Undue hardship," within the meaning of Title VII provision requiring employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business, is shown when a burden is substantial in the overall context of an employer's business, which involves a fact-specific inquiry. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

8 Cases that cite this headnote

**[4]** **Statutes** Language

Statutory interpretation must begin with, and ultimately heed, what a statute actually says.

[5] **Civil Rights** Defenses in general

For an employer to defend a denial of a religious accommodation under Title VII, the employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business; abrogating *Equal Employment Opportunity Commission v. Walmart Stores East, L.P.*, 992 F.3d 656; *Tagore v. U.S.*, 735 F.3d 324; *Wagner v. Saint Joseph's/Candler Health System, Inc.*, 2022 WL 905551; *Camara v. Epps Air Service, Inc.*, 292 F. Supp. 3d 1314; *El-Amin v. First Transit, Inc.*, 2005 WL 1118175; *E.E.O.C. v. Sambo's of Georgia, Inc.*, 530 F.Supp. 86. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

6 Cases that cite this headnote

[6] **Civil Rights** Accommodations

Courts must apply the test for determining under Title VII whether providing a religious accommodation to an employee would result in an undue hardship to the employer in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

2 Cases that cite this headnote

[7] **Civil Rights** Accommodations

The term "undue hardship," in Title VII provision requiring employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business, means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

3 Cases that cite this headnote

[8] **Civil Rights** Accommodations

Not all impacts on coworkers are relevant for determining whether under Title VII an employer need not provide a religious accommodation to an employee because doing so would result in an undue hardship on the conduct of the employer's business, but only coworker impacts that go on to affect the conduct of the business. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

[9] **Civil Rights** Accommodations

A religious accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court cannot stop its analysis of whether under Title VII providing the accommodation to an employee would result in an undue hardship on the conduct of the employer's business without examining whether that further logical step is shown in a particular case. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

[10] **Civil Rights** Accommodations

A coworker's dislike of religious practice and expression in the workplace or the mere fact of a religious accommodation is not cognizable to factor into the inquiry into whether under Title VII an employer need not provide a religious accommodation to an employee because doing so would result in an undue hardship on the conduct of the employer's business. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

2 Cases that cite this headnote

[11] **Civil Rights** Defenses in general

An employer who fails to provide a religious accommodation to an employee has a defense under Title VII only if the hardship is "undue," and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered undue. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

4 Cases that cite this headnote

**[12]** **Civil Rights** Defenses in general

If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim under Title VII, Title VII would be at war with itself. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

1 Case that cites this headnote

**[13]** **Civil Rights** Accommodations

Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

2 Cases that cite this headnote

**[14]** **Civil Rights** Accommodations

Faced with an accommodation request under Title VII not to work on the Sabbath for religious reasons, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship; consideration of other options, such as voluntary shift swapping, would also be necessary before denying the accommodation. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e(j).

****2281** *Syllabus*[*]

Petitioner Gerald Groff is an Evangelical Christian who believes for religious reasons that Sunday should be devoted to worship and rest. In 2012, Groff took a mail delivery job with the United States Postal Service. Groff's position generally did not involve Sunday work, but that changed after USPS agreed to begin facilitating Sunday deliveries for Amazon. To avoid the requirement to work Sundays on a rotating basis, Groff transferred to a rural USPS station that did not make Sunday deliveries. After Amazon deliveries began at that station as well, Groff remained unwilling to work Sundays, and USPS redistributed Groff's Sunday deliveries to other USPS staff. Groff received "progressive discipline" for failing to work on Sundays, and he eventually resigned.

Groff sued under Title VII of the Civil Rights Act of 1964, asserting that USPS could have accommodated his Sunday Sabbath practice "without undue hardship on the conduct of [USPS's] business." 42 U.S.C. § 2000e(j). The District Court granted summary judgment to USPS. The Third Circuit affirmed based on this Court's decision in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113, which it construed to mean "that requiring an employer 'to bear more than a de minimis cost' to provide a religious accommodation is an undue hardship." 35 F.4th 162, 174, n. 18 (quoting 432 U.S. at 84, 97 S.Ct. 2264). The Third Circuit found the *de minimis* cost standard met here, concluding that exempting Groff from Sunday work had "imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale." 35 F.4th at 175.

*Held*: Title VII requires an employer that denies a religious accommodation to show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. Pp. 2287 – 2297.

(a) This case presents the Court's first opportunity in nearly 50 years to explain the contours of *Hardison*. The background of that decision helps to explain the Court's disposition of this case. Pp. 2287 – 2294.

(1) Title VII of the Civil Rights Act of 1964 made it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges [of] employment, because of such individual's ... religion." § 2000e–2(a)(1). As originally enacted, Title VII did not spell out what it meant by discrimination "because of ... religion." Subsequent regulations issued by the EEOC obligated employers "to make reasonable accommodations to the religious needs of employees" whenever doing so would not create "undue hardship on the conduct of the employer's business." 29 C.F.R. § 1605.1 (1968). In 1970, however, the Sixth Circuit held that Title VII did not require an employer "to accede to or accommodate" a Sabbath religious practice because to

do so "would raise grave" Establishment Clause questions. *Dewey v. Reynolds Metals Co.*, 429 F.2d 324, 334. This Court affirmed *Dewey* by an evenly divided vote. See 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267. Congress responded by amending Title VII in 1972 to track the EEOC's regulatory language and to clarify that employers must "reasonably accommodate... an employee's or prospective employee's religious observance or practice" unless the employer is "unable" to do so "without undue hardship on the conduct of the employer's business." § 2000e(j). Pp. 2287 – 2289.

(2) *Hardison* concerned an employment dispute that arose prior to the 1972 amendments to Title VII. In 1967, Trans World Airlines hired Larry Hardison to work in a department that operated "24 hours per day, 365 days per year" and played an "essential role" for TWA by providing parts needed to repair and maintain aircraft. *Hardison*, 432 U.S. at 66, 97 S.Ct. 2264. Hardison later underwent a religious conversion and began missing work to observe the Sabbath. Initial conflicts with Hardison's work schedule were resolved, but conflicts resurfaced when he transferred to another position in which he lacked the seniority to avoid work during his Sabbath. Attempts at accommodation failed, and TWA discharged Hardison for insubordination.

Hardison sued TWA and his union, and the Eighth Circuit sided with Hardison. The Eighth Circuit found that reasonable accommodations were available to TWA, and rejected the defendants' Establishment Clause arguments. *Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33, 42–44. This Court granted certiorari. TWA's petition for certiorari asked this Court to decide whether the 1972 amendment of Title VII violated the Establishment Clause as applied by the Eighth Circuit, particularly insofar as that decision had approved an accommodation that allegedly overrode seniority rights granted by the relevant collective bargaining agreement. At the time, some thought that the Court's now-abrogated decision in *Lemon* v. *Kurtzman*, 403 U. S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745—which adopted a test under which any law whose "principal or primary effect" "was to advance religion" was unconstitutional, *id.*, at 612–613, 91 S.Ct. 2105—posed a serious problem for the 1972 amendment of Title VII. Ultimately, however, constitutional concerns played no on-stage role in the Court's decision in *Hardison*. Instead, the Court's opinion stated that "the principal issue on which TWA and the union came to this Court" was whether Title VII "require[s] an employer and a union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices." *Hardison*, 432 U.S. at 83, and n. 14, 97 S.Ct. 2264. The Court held that Title VII imposed no such requirement. *Id.*, at 83, and n. 14, 97 S.Ct. 2264. This conclusion, the Court found, was "supported by the fact that seniority systems are afforded special treatment under Title VII itself." *Id.*, at 81, 97 S.Ct. 2264. Applying this interpretation of Title VII and disagreeing with the Eighth Circuit's evaluation of the factual record, the Court identified no way in which TWA, without violating seniority rights, could have feasibly accommodated Hardison's request for an exemption from work on his Sabbath.

The parties had not focused on determining when increased costs amount to "undue hardship" under Title VII separately from the seniority issue. But the Court's opinion in *Hardison* contained this oft-quoted sentence: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." Although many lower courts later viewed this line as the authoritative interpretation of the statutory term "undue hardship," the context renders that reading doubtful. In responding to Justice Marshall's dissent, the Court described the governing standard quite differently, stating three times that an accommodation is not required when it entails "substantial" "costs" or "expenditures." *Id.*, at 83, n. 14, 97 S.Ct. 2264. Pp. 2288 – 2292.

(3) Even though *Hardison*'s reference to "*de minimis*" was undercut by conflicting language and was fleeting in comparison to its discussion of the "principal issue" of seniority rights, lower courts have latched on to "*de minimis*" as the governing standard. To be sure, many courts have understood that the protection for religious adherents is greater than "more than ... *de minimis*" might suggest when read in isolation. But diverse religious groups tell the Court that the "*de minimis*" standard has been used to deny even minor accommodations. The EEOC has also accepted *Hardison* as prescribing a "more than a *de minimis* cost" test, 29 C.F.R. § 1605.2(e)(1), though it has tried to soften its impact, cautioning against extending the phrase to cover such things as the "administrative costs" involved in reworking schedules, the "infrequent" or temporary "payment of premium wages for a substitute," and "voluntary substitutes and swaps" when they are not contrary to a "bona fide seniority system." §§ 1605.2(e)(1), (2). Yet some courts have rejected even the EEOC's gloss on "*de minimis*," rejecting accommodations the EEOC's guidelines consider to be ordinarily required. The Court agrees with the Solicitor General that *Hardison* does not compel courts to read the

"more than *de minimis*" standard "literally" or in a manner that undermines *Hardison*'s references to "substantial" cost. Tr. of Oral Arg. 107. Pp. 2292 – 2294.

(b) The Court holds that showing "more than a *de minimis* cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. *Hardison* cannot be reduced to that one phrase. In describing an employer's "undue hardship" defense, *Hardison* referred repeatedly to "substantial" burdens, and that formulation better explains the decision. The Court understands *Hardison* to mean that "undue hardship" is shown when a burden is substantial in the overall context of an employer's business. This fact-specific inquiry comports with both *Hardison* and the meaning of "undue hardship" in ordinary speech. Pp. 2294 – 2297.

(1) To determine what an employer must prove to defend a denial of a religious accommodation under Title VII, the Court begins with Title VII's text. The statutory term, "hardship," refers to, at a minimum, "something hard to bear" and suggests something more severe than a mere burden. If Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs. Adding the modifier "undue" means that the requisite burden or adversity must rise to an "excessive" or "unjustifiable" level. Understood in this way, "undue hardship" means something very different from a burden that is merely more than *de minimis*, *i.e.,* "very small or trifling." The ordinary meaning of "undue hardship" thus points toward a standard closer to *Hardison*'s references to "substantial additional costs" or "substantial expenditures." 432 U.S. at 83, n. 14, 97 S.Ct. 2264. Further, the Court's reading of the statutory term comports with pre-1972 EEOC decisions, so nothing in that history plausibly suggests that "undue hardship" in Title VII should be read to mean anything less than its meaning in ordinary use. Cf. *George* v. *McDonough*, 596 U. S. ——, ——, 142 S.Ct. 1953, 1959, 213 L.Ed.2d 265. And no support exists in other factors discussed by the parties for reducing *Hardison* to its "more than a *de minimis* cost" line. Pp. 2294 – 2295.

(2) The parties agree that the "*de minimis*" test is not right, but they differ in the alternative language they propose. The Court thinks it is enough to say that what an employer must show is that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. *Hardison*, 432 U.S. at 83, n. 14, 97 S.Ct. 2264. Courts must apply the test to take into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer. P. 2295.

(3) The Court declines to adopt the elaborations of the applicable standard that the parties suggest, either to incorporate Americans with Disabilities Act case law or opine that the EEOC's construction of *Hardison* has been basically correct. A good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by the Court's clarifying decision. But it would not be prudent to ratify *in toto* a body of EEOC interpretation that has not had the benefit of the clarification the Court adopts today. What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test. Pp. 2295 – 2296.

(4) The Court also clarifies several recurring issues. First, as the parties agree, Title VII requires an assessment of a possible accommodation's effect on "the conduct of the employer's business." § 2000e(j). Impacts on coworkers are relevant only to the extent those impacts go on to affect the conduct of the business. A court must analyze whether that further logical step is shown. Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue." Bias or hostility to a religious practice or accommodation cannot supply a defense.

Second, Title VII requires that an employer "reasonably accommodate" an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. Faced with an accommodation request like Groff 's, an employer must do more that conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options would also be necessary. Pp. 2296 – 2297.

(c) Having clarified the Title VII undue-hardship standard, the Court leaves the context-specific application of that clarified standard in this case to the lower courts in the first instance. P. 2297.

35 F.4th 162, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion, in which JACKSON, J., joined.

**Attorneys and Law Firms**

Aaron Streett, Houston, TX, for petitioner.

Elizabeth B. Prelogar, Solicitor General, Washington, DC, for respondent.

Kelly J. Shackelford, Jeffrey C. Mateer, Hiram S. Sasser, III, David J. Hacker, First Liberty Institute, Plano, TX, Aaron M. Streett, Counsel of Record, J. Mark Little, Christopher E. Tutunjian, Baker Botts L.L.P., Houston, TX, Stephanie N. Taub, First Liberty Institute, Cabot, AR, Alan J. Reinach, Jonathon Cherne, Church State Council, Westlake Village, CA, Randall Luke Wenger, Jeremy L. Samek, Janice Martino-Gottshall, Independence Law Center, Harrisburg, PA, for petitioner.

Elizabeth B. Prelogar, Solicitor General, Counsel of Record, Brian M. Boynton, Principal Deputy Assistant Attorney General, Brian H. Fletcher, Deputy Solicitor General, Aimee W. Brown, Assistant to the Solicitor General, Charles W. Scarborough, McKaye L. Neumeister, Department of Justice, Washington, DC, for Postmaster General.

**Opinion**

Justice ALITO delivered the opinion of the Court.

***453** ****2286** Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees ***454** unless doing so would impose an "undue hardship on the conduct of the employer's business." 78 Stat. 253, as amended, 42 U.S.C. § 2000e(j). Based on a line in this Court's decision in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), many lower courts, including the Third Circuit below, have interpreted "undue hardship" to mean any effort or cost that is "more than ... *de minimis*." In this case, however, both parties—the plaintiff-petitioner, Gerald Groff, and the defendant-respondent, the Postmaster General, represented by the Solicitor General—agree that the *de minimis* reading of *Hardison* is a mistake. With the benefit of thorough briefing and oral argument, we today clarify what Title VII requires.

I

Gerald Groff is an Evangelical Christian who believes for religious reasons that Sunday should be devoted to worship and rest, not "secular labor" and the "transport[ation]" of worldly "goods." App. 294. In 2012, Groff began his employment with the United States Postal Service (USPS), which has more than 600,000 employees. He became a Rural Carrier Associate, a job that required him to assist regular carriers in the delivery of mail. When he took the position, it generally did not involve Sunday work. But within a few years, that changed. In 2013, USPS entered into an agreement with Amazon to begin facilitating Sunday deliveries, and in 2016, USPS signed a memorandum of understanding with the relevant union (the National Rural Letter Carriers' Association) that set out how Sunday and holiday parcel delivery would be handled. During a 2-month peak season, each post office would use its own staff to deliver packages. At all other times, Sunday and holiday deliveries would be carried out by employees (including Rural Carrier Associates like Groff) working from a "regional hub." For Quarryville, Pennsylvania, where Groff was originally stationed, the regional hub was the Lancaster Annex.

***455** The memorandum specifies the order in which USPS employees are to be called on for Sunday work outside the peak season. First in line are each hub's "Assistant Rural Carriers"— part-time employees who are assigned to the hub and cover only Sundays and holidays. Second are any volunteers from the geographic area, who are assigned on a rotating basis. And third are all other carriers, who are compelled to do the work on a rotating basis. Groff fell into this third category, and after the memorandum of understanding was adopted, he was told that he would be required to work on Sunday. He then sought and received a transfer to Holtwood, a small rural USPS station that had only seven employees and that, at the time, did not make Sunday deliveries. But in March 2017, Amazon deliveries began there as well.

With Groff unwilling to work on Sundays, USPS made other arrangements. During the peak season, Sunday deliveries that would have otherwise been performed by Groff were carried out by the rest of the Holtwood staff, including the postmaster, whose job ordinarily does not involve delivering mail. During other months, Groff 's Sunday assignments were redistributed to other carriers assigned to the regional hub.[1] Throughout this time, Groff ****2287** continued to receive "progressive

discipline" for failing to work on Sundays. 35 F.4th 162, 166 (C.A.3 2022). Finally, in January 2019, he resigned.[2]

***456** A few months later, Groff sued under Title VII, asserting that USPS could have accommodated his Sunday Sabbath practice "without undue hardship on the conduct of [USPS's] business." 42 U.S.C. § 2000e(j). The District Court granted summary judgment to USPS, 2021 WL 1264030 (ED Pa., Apr. 6, 2021), and the Third Circuit affirmed. The panel majority felt that it was "bound by [the] ruling" in *Hardison*, which it construed to mean "that requiring an employer 'to bear more than a de minimis cost' to provide a religious accommodation is an undue hardship." 35 F.4th at 174, n. 18 (quoting 432 U.S. at 84, 97 S.Ct. 2264). Under Circuit precedent, the panel observed, this was "not a difficult threshold to pass," 35 F.4th at 174 (internal quotation marks omitted), and it held that this low standard was met in this case. Exempting Groff from Sunday work, the panel found, had "imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale." *Id.*, at 175. Judge Hardiman dissented, concluding that adverse "effects on USPS employees in Lancaster or Holtwood" did not alone suffice to show the needed hardship "on the employer's *business*." *Id.*, at 177 (emphasis in original).

We granted Groff 's ensuing petition for a writ of certiorari. 598 U. S. ——, 143 S.Ct. 646, 214 L.Ed.2d 382 (2023).

## II

Because this case presents our first opportunity in nearly 50 years to explain the contours of *Hardison*, we begin by recounting the legal backdrop to that case, including the development of the Title VII provision barring religious discrimination and the Equal Employment Opportunity Commission's (EEOC's) regulations and guidance regarding that prohibition. We then summarize how the *Hardison* case progressed to final decision, and finally, we discuss ***457** how courts and the EEOC have understood its significance. This background helps to explain the clarifications we offer today.

### A

Since its passage, Title VII of the Civil Rights Act of 1964 has made it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges [of] employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1) (1964 ed.). As originally enacted, Title VII did not spell out what it meant by discrimination "because of ... religion," but shortly after the statute's passage, the EEOC interpreted that provision to mean that employers were sometimes required to "accommodate" the "reasonable religious needs of employees." 29 C.F.R. § 1605.1(a)(2) (1967). After some tinkering, the EEOC settled on a formulation that obligated employers "to make reasonable accommodations to the religious needs of ****2288** employees" whenever that would not work an "undue hardship on the conduct of the employer's business." 29 C.F.R. § 1605.1 (1968).

Between 1968 and 1972, the EEOC elaborated on its understanding of "undue hardship" in a "long line of decisions" addressing a variety of policies. *Hardison*, 432 U.S. at 85, 97 S.Ct. 2264 (Marshall, J., dissenting); see Brief for General Conference of Seventh-day Adventists as *Amicus Curiae* 10–22 (collecting decisions). Those decisions addressed many accommodation issues that still arise frequently today, including the wearing of religious garb[3] and time off from work to attend to religious obligations.[4]

***458** EEOC decisions did not settle the question of undue hardship. In 1970, the Sixth Circuit held (in a Sabbath case) that Title VII as then written did not require an employer "to accede to or accommodate" religious practice because that "would raise grave" Establishment Clause questions. *Dewey v. Reynolds Metals Co.*, 429 F.2d 324, 334. This Court granted certiorari, 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621, but then affirmed by an evenly divided vote, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971).

Responding to *Dewey* and another decision rejecting any duty to accommodate an employee's observance of the Sabbath, Congress amended Title VII in 1972. *Hardison*, 432 U.S. at 73–74, 97 S.Ct. 2264; *id.*, at 88–89, 97 S.Ct. 2264 (Marshall, J., dissenting). Tracking the EEOC's regulatory language, Congress provided that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (1970 ed., Supp. II).

***459** B

The *Hardison* case concerned a dispute that arose during the interval between the issuance of the EEOC's "undue hardship" regulation and the 1972 amendment to Title VII. In 1967, Larry Hardison was hired as a clerk at the Stores Department in the Kansas City base of Trans World Airlines (TWA). The Stores Department was responsible for providing parts needed to repair and maintain aircraft. ****2289** *Hardison v. Trans World Airlines*, 375 F.Supp. 877, 889 (WD Mo. 1974). It played an "essential role" and operated "24 hours per day, 365 days per year." *Hardison*, 432 U.S. at 66, 97 S.Ct. 2264. After taking this job, Hardison underwent a religious conversion. He began to observe the Sabbath by absenting himself from work from sunset on Friday to sunset on Saturday, and this conflicted with his work schedule. The problem was solved for a time when Hardison, who worked in Building 1, switched to the night shift, but it resurfaced when he sought and obtained a transfer to the day shift in Building 2 so that he could spend evenings with his wife. 375 F.Supp. at 889. In that new building, he did not have enough seniority to avoid work during his Sabbath. Attempts at accommodation failed, and he was eventually "discharged on grounds of insubordination." 432 U.S. at 69, 97 S.Ct. 2264.

Hardison sued TWA and his union, the International Association of Machinists and Aerospace Workers (IAM).[5] The Eighth Circuit found that reasonable accommodations were available, and it rejected the defendants' Establishment Clause arguments. *Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33, 42–44 (1975).

Both TWA and IAM then filed petitions for certiorari, with TWA's lead petition asking this Court to decide whether the 1972 amendment of Title VII violated the Establishment Clause as applied in the decision below, particularly insofar ***460** as that decision had approved an accommodation that allegedly overrode seniority rights granted by the relevant collective bargaining agreement.[6] The Court granted both petitions. 429 U. S. 958, 97 S.Ct. 381, 50 L.Ed.2d 325 (1976).

When the Court took that action, all counsel had good reason to expect that the Establishment Clause would figure prominently in the Court's analysis. As noted above, in June 1971, the Court, by an equally divided vote, had affirmed the Sixth Circuit's decision in *Dewey*, which had heavily relied on Establishment Clause avoidance to reject the interpretation of Title VII set out in the EEOC's reasonable-accommodation guidelines. Just over three weeks later, the Court had handed down its (now abrogated)[7] decision in *Lemon* v. *Kurtzman*, 403 U. S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) which adopted a test under which any law whose "principal or primary effect" "was to advance religion" was unconstitutional. *Id.*, at 612–613, 91 S.Ct. 2105. Because it could be argued that granting a special accommodation to a religious practice had just such a purpose and effect, some thought that *Lemon* posed a serious problem for the 1972 amendment of Title VII. And shortly before review was granted in *Hardison*, the Court had announced that the Justices were evenly divided in a case that challenged the 1972 amendment as a violation of the Establishment Clause. *Parker Seal Co. v. Cummins*, 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976) (*per curiam*).

Against this backdrop, both TWA and IAM challenged the constitutionality of requiring any accommodation for religious practice. The Summary of Argument in TWA's brief began with this categorical ****2290** assertion: "The religious accommodation requirement of Title VII violates the Establishment Clause of the First Amendment." Brief for Petitioner TWA in O. T. 1976, No. 75–1126, p. 19. Applying the three-part *Lemon* test, TWA argued that any such accommodation ***461** has the primary purpose and effect of advancing religion and entails "pervasive" government "entanglement ... in religious issues." Brief for Petitioner TWA in No. 75–1126, at 20. The union's brief made a similar argument, Brief for Petitioner IAM, O. T. 1976, No. 75–1126, pp. 21–24, 50–72, but stressed the special status of seniority rights under Title VII, *id.*, at 24–36.

**[1]** Despite the prominence of the Establishment Clause in the briefs submitted by the parties and their *amici*,[8] constitutional concerns played no on-stage role in the Court's opinion, which focused instead on seniority rights.[9] The opinion ***462** stated that "the principal issue on which TWA and the union came to this Court" was whether Title VII "require[s] an employer and a union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices." 432 U.S. at 83, and n. 14, 97 S.Ct. 2264. The Court held that Title VII imposed no such requirement. *Ibid.* This conclusion, the Court found, was "supported by the fact that seniority systems are afforded special treatment under Title VII itself." *Id.*, at 81, 97 S.Ct. 2264. It noted that Title VII expressly provides special protection for " 'bona fide seniority ... system[s],' " *id.*, at 81–82, 97 S.Ct. 2264 (quoting 42 U.S.C. § 2000e–2(h)), and it cited precedent reading the

statute " 'to make clear that the routine application of a bona fide seniority system [is] not ... unlawful under Title VII.' " 432 U.S. at 82, 97 S.Ct. 2264 (quoting *Teamsters v. United States*, 431 U.S. 324, 352, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Invoking these authorities, ****2291** the Court found that the statute did not require an accommodation that involuntarily deprived employees of seniority rights. 432 U.S. at 80, 97 S.Ct. 2264.[10]

Applying this interpretation of Title VII and disagreeing with the Eighth Circuit's evaluation of the factual record, the Court identified no way in which TWA, without violating seniority rights, could have feasibly accommodated Hardison's request for an exemption from work on his Sabbath. The Court found that not enough co-workers were willing to take Hardison's shift voluntarily, that compelling them to do so would have violated their seniority rights, and that leaving the Stores Department short-handed would have adversely affected its "essential" mission. *Id.*, at 68, 80, 97 S.Ct. 2264.

***463** The Court also rejected two other options offered in Justice Marshall's dissent: (1) paying other workers overtime wages to induce them to work on Saturdays and making up for that increased cost by requiring Hardison to work overtime for regular wages at other times and (2) forcing TWA to pay overtime for Saturday work for three months, after which, the dissent thought, Hardison could transfer back to the night shift in Building 1. The Court dismissed both of these options as not "feasible," *id.*, at 83, n. 14, 97 S.Ct. 2264, but it provided no explanation for its evaluation of the first. In dissent, Justice Marshall suggested one possible reason: that the collective bargaining agreement might have disallowed Hardison's working overtime for regular wages. *Id.*, at 95, 97 S.Ct. 2264 (dissenting opinion). But the majority did not embrace that explanation.

As for the second, the Court disputed the dissent's conclusion that Hardison, if he moved back to Building 1, would have had enough seniority to choose to work the night shift. *Id.*, at 83, n. 14, 97 S.Ct. 2264. That latter disagreement was key. The dissent thought that Hardison could have resumed the night shift in Building 1 after just three months, and it therefore calculated what it would have cost TWA to pay other workers' overtime wages on Saturdays for that finite period of time. According to that calculation, TWA's added expense for three months would have been $150 (about $1,250 in 2022 dollars).[11] *Id.*, at 92, n. 6, 97 S.Ct. 2264. But the Court doubted that Hardison could have regained the seniority rights he had enjoyed in Building 1 prior to his transfer, and if that were true, TWA would have been required to pay other workers overtime for Saturday work indefinitely. Even under Justice Marshall's math, that would have worked out to $600 per year at the time, or roughly $5,000 per year today.

***464** In the briefs and at argument, little space was devoted to the question of determining when increased costs amount to an "undue hardship" under the statute, but a single, but oft-quoted, sentence in the opinion of the Court, if taken literally, suggested that even a pittance might be too much for an employer to be forced to endure. The line read as follows: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." *Id.*, at 84, 97 S.Ct. 2264.

Although this line would later be viewed by many lower courts as the authoritative ****2292** interpretation of the statutory term "undue hardship," it is doubtful that it was meant to take on that large role. In responding to Justice Marshall's dissent, the Court described the governing standard quite differently, stating three times that an accommodation is not required when it entails "substantial" "costs" or "expenditures." *Id.*, at 83, n. 14, 97 S.Ct. 2264. This formulation suggests that an employer may be required to bear costs and make expenditures that are not "substantial." Of course, there is a big difference between costs and expenditures that are not "substantial" and those that are "de minimis," which is to say, so "very small or trifling" that that they are not even worth noticing. Black's Law Dictionary 388 (5th ed. 1979).

The Court's response to Justice Marshall's estimate of the extra costs that TWA would have been required to foot is also telling. The majority did not argue that Justice Marshall's math produced considerably "more than a *de minimis* cost" (as it certainly did). Instead, the Court responded that Justice Marshall's calculation involved assumptions that were not "feasible under the circumstances" and would have produced a different conflict with "the seniority rights of other employees." 432 U.S. at 83, n. 14, 97 S.Ct. 2264; see Brief for United States 29, n. 4 (noting that *Hardison* "specifically rejected" the dissent's calculations and that it is "wrong to assert" that *Hardison* held that a $150 cost was an undue hardship).

***465** Ultimately, then, it is not clear that any of the possible accommodations would have actually solved Hardison's problem without transgressing seniority rights. The *Hardison* Court was very clear that those rights were off-limits. Its

guidance on "undue hardship" in situations not involving seniority rights is much less clear.

C

Even though *Hardison*'s reference to "*de minimis*" was undercut by conflicting language and was fleeting in comparison to its discussion of the "principal issue" of seniority rights, lower courts have latched on to "*de minimis*" as the governing standard.

To be sure, as the Solicitor General notes, some lower courts have understood that the protection for religious adherents is greater than "more than ... *de minimis*" might suggest when read in isolation. But a bevy of diverse religious organizations has told this Court that the *de minimis* test has blessed the denial of even minor accommodation in many cases, making it harder for members of minority faiths to enter the job market. See, *e.g.*, Brief for The Sikh Coalition et al. as *Amici Curiae* 15, 19–20 ("the de minimis standard eliminates any meaningful mandate to accommodate Sikh practices in the workplace" and "emboldens employers to deny reasonable accommodation requests"); Brief for Council on American-Islamic Relations as *Amicus Curiae* 3 (Muslim women wearing religiously mandated attire "have lost employment opportunities" and have been excluded from "critical public institutions like public schools, law enforcement agencies, and youth rehabilitation centers"); Brief for Union of Orthodox Jewish Congregations of America as *Amicus Curiae* 14–15 (because the "*de minimis* cost" test "can be satisfied in nearly any circumstance," "Orthodox Jews once again [are] left at the mercy of their employers' good graces"); Brief for Seventh-day Adventist Church in Canada et al. as *Amici Curiae* 8 (joint brief of Sabbatarian faiths ***466** arguing that Sabbath accommodation under the *de minimis* standard is left to "their employers' and coworkers' goodwill").

****2293** The EEOC has also accepted *Hardison* as prescribing a " 'more than a *de minimis* cost' " test, 29 C.F.R. § 1605.2(e)(1) (2022), but has tried in some ways to soften its impact. It has specifically cautioned (as has the Solicitor General in this case) against extending the phrase to cover such things as the "administrative costs" involved in reworking schedules, the "infrequent" or temporary "payment of premium wages for a substitute," and "voluntary substitutes and swaps" when they are not contrary to a "bona fide seniority system." §§ 1605.2(e)(1), (2).

Nevertheless, some courts have rejected even the EEOC's gloss on "*de minimis*."[12] And in other cases, courts have rejected accommodations that the EEOC's guidelines consider to be ordinarily required, such as the relaxation of dress codes and coverage for occasional absences.[13] ***467** Members of this Court have warned that, if the *de minimis* rule represents the holding of *Hardison*, the decision might have to be reconsidered. *Small* v. *Memphis Light, Gas & Water*, 593 U. S. ––––, 141 S.Ct. 1227, 209 L.Ed.2d 538 (2021) (GORSUCH, J., dissenting from denial of certiorari); *Patterson* v. *Walgreen Co.*, 589 U. S. ––––, 140 S.Ct. 685, 206 L.Ed.2d 230 (2020) (ALITO, J., concurring in denial of certiorari). Four years ago, the Solicitor General—joined on its brief by the EEOC—likewise took that view. Brief for United States as *Amicus Curiae* in *Patterson v. Walgreen Co.*, O. T. 2019, No. 18349, p. 20 ("Contrary to *Hardison*, therefore, an 'undue hardship' is not best interpreted to mean 'more than a *de minimis* cost' ").

Today, the Solicitor General disavows its prior position that *Hardison* should be overruled—but only on the understanding that *Hardison* does not compel courts to read the "more than *de minimis*" standard "literally" or in a manner that undermines *Hardison*'s references to "substantial" cost.[14] Tr. of Oral Arg. 107. With the benefit ****2294** of comprehensive briefing and oral argument, we agree.[15]

***468** III

**[2]** **[3]** We hold that showing "more than a *de minimis* cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. *Hardison* cannot be reduced to that one phrase. In describing an employer's "undue hardship" defense, *Hardison* referred repeatedly to "substantial" burdens, and that formulation better explains the decision. We therefore, like the parties, understand *Hardison* to mean that "undue hardship" is shown when a burden is substantial in the overall context of an employer's business. See Tr. of Oral Arg. 61–62 (argument of Solicitor General). This fact-specific inquiry comports with both *Hardison* and the meaning of "undue hardship" in ordinary speech.

A

**[4]** As we have explained, we do not write on a blank slate in determining what an employer must prove to defend a denial of a religious accommodation, but we think it reasonable to begin with Title VII's text. After all, as we have stressed over and over again in recent years, statutory interpretation must "begi[n] with," and ultimately heed, what a statute actually says. *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, ——, 138 S.Ct. 617, 631, 199 L.Ed.2d 501 (2018) (internal quotation marks omitted); see *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 74, 143 S.Ct. 665, 214 L.Ed.2d 434 (2023); *Intel Corp. Investment Policy Comm.* v. *Sulyma*, 589 U. S. ——, —— – ——, ——, 140 S.Ct. 768, 775–776, 777–778, 206 L.Ed.2d 103 (2020).Here, the key statutory term is "undue hardship." In common parlance, a "hardship" is, at a minimum, "something hard to bear." Random House Dictionary of the English Language 646 (1966) (Random House). Other definitions go further. See, *e.g.*, Webster's Third ***469** New International Dictionary 1033 (1971) (Webster's Third) ("something that causes or entails suffering or privation"); American Heritage Dictionary 601 (1969) (American Heritage) ("[e]xtreme privation; adversity; suffering"); Black's Law Dictionary, at 646 ("privation, suffering, adversity"). But under any definition, a hardship is more severe than a mere burden. So even if Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "excessive" or "unjustifiable" level. Random House 1547; see, *e.g.*, Webster's Third 2492 ("inappropriate," "unsuited," or "exceeding or violating propriety or fitness"); American Heritage 1398 ("excessive"). The Government agrees, noting that " 'undue hardship means something greater than hardship.' " Brief for United States 30; see *id.*, at 39 (arguing that "accommodations should be assessed while 'keep[ing] in mind both words in the key phrase of the actual statutory text: "undue" and "hardship" ' " ****2295** (quoting *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 456 (C.A.7 2013)).

When "undue hardship" is understood in this way, it means something very different from a burden that is merely more than *de minimis*, *i.e.*, something that is "very small or trifling." Black's Law Dictionary, at 388. So considering ordinary meaning while taking *Hardison* as a given, we are pointed toward something closer to *Hardison*'s references to "substantial additional costs" or "substantial expenditures." 432 U.S. at 83, n. 14, 97 S.Ct. 2264.

Similarly, while we do not rely on the pre-1972 EEOC decisions described above to define the term, we do observe that these decisions often found that accommodations that entailed substantial costs were required. See *supra*, at 2287 – 2288, nn. 3–4. Nothing in this history plausibly suggests that ***470** "undue hardship" in Title VII should be read to mean anything less than its meaning in ordinary use. Cf. *George* v. *McDonough*, 596 U. S. ——, ——, 142 S.Ct. 1953, 1959, 213 L.Ed.2d 265 (2022) (a "robust regulatory backdrop" can "fil[l] in the details" of a statutory scheme's use of a specific term).

In short, no factor discussed by the parties—the ordinary meaning of "undue hardship," the EEOC guidelines that *Hardison* concluded that the 1972 amendment " 'ratified,' " 432 U.S. at 76, n. 11, 97 S.Ct. 2264 (internal quotation marks omitted), the use of that term by the EEOC prior to those amendments, and the common use of that term in other statutes—supports reducing *Hardison* to its "more than a *de minimis* cost" line. See Brief for United States 39 (arguing that "the Court could emphasize that *Hardison*'s language does not displace the statutory standard").

B

**[5]** In this case, both parties agree that the "*de minimis*" test is not right, but they differ slightly in the alternative language they prefer. Groff likes the phrase "significant difficulty or expense." Brief for Petitioner 15; Reply Brief 2. The Government, disavowing its prior position that Title VII's text requires overruling *Hardison*, points us to *Hardison*'s repeated references to "substantial expenditures" or "substantial additional costs." Brief for United States 28–29 (citing 432 U.S. at 83–84, and n. 14, 97 S.Ct. 2264); see Brief for United States 39. We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. *Hardison*, 432 U.S. at 83, n. 14, 97 S.Ct. 2264.

**[6]** What matters more than a favored synonym for "undue hardship" (which is the actual text) is that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, ***471**

"size and operating cost of [an] employer." Brief for United States 40 (internal quotation marks omitted).

C

The main difference between the parties lies in the further steps they would ask us to take in elaborating upon their standards. Groff would not simply borrow the phrase "significant difficulty or expense" from the Americans with Disabilities Act (ADA) but would have us instruct lower courts to "draw upon decades of ADA caselaw." Reply Brief 13. The Government, on the other hand, requests that we opine that the EEOC's construction of *Hardison* has been basically correct. Brief for United States 39.

****2296** **[7]** Both of these suggestions go too far. We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today. After all, as a public advocate for employee rights, much of the EEOC's guidance has focused on what should be accommodated. Accordingly, today's clarification may prompt little, if any, change in the agency's guidance explaining why no undue hardship is imposed by temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs. See 29 C.F.R. § 1605.2(d). But it would not be prudent to ratify *in toto* a body of EEOC interpretation that has not had the benefit of the clarification we adopt today. What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test.

D

The erroneous *de minimis* interpretation of *Hardison* may have had the effect of leading courts to pay insufficient attention to what the actual text of Title VII means with regard ***472** to several recurring issues. Since we are now brushing away that mistaken view of *Hardison*'s holding, clarification of some of those issues—in line with the parties' agreement in this case—is in order.

**[8]** **[9]** First, on the second question presented, both parties agree that the language of Title VII requires an assessment of a possible accommodation's effect on "the conduct of the employer's business." 42 U.S.C. § 2000e(j); see 35 F.4th at 177–178 (Hardiman, J., dissenting). As the Solicitor General put it, not all "impacts on coworkers ... are relevant," but only "coworker impacts" that go on to "affec[t] the conduct of the business." Tr. of Oral Arg. 102–104. So an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court cannot stop its analysis without examining whether that further logical step is shown in a particular case.

**[10]** **[11]** **[12]** On this point, the Solicitor General took pains to clarify that some evidence that occasionally is used to show "impacts" on coworkers is "off the table" for consideration. *Id.*, at 102. Specifically, a coworker's dislike of "religious practice and expression in the workplace" or "the mere fact [of] an accommodation" is not "cognizable to factor into the undue hardship inquiry." *Id.*, at 89–90. To the extent that this was not previously clear, we agree. An employer who fails to provide an accommodation has a defense only if the hardship is "undue," and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered "undue." If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself. See *id.*, at 89 (argument of Solicitor General) (such an approach would be "giving effect to religious hostility"); contra, *EEOC v. Sambo's of Georgia, Inc.*, 530 F.Supp. 86, 89 (ND Ga. 1981) (considering ***473** as hardship "[a]dverse customer reaction" from "a simple aversion to, or discomfort in dealing with, bearded people").

**[13]** **[14]** Second, as the Solicitor General's authorities underscore, Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. See *Adeyeye*, 721 F.3d at 455; see also Brief for United ****2297** States 30, 33, 39. This distinction matters. Faced with an accommodation request like Groff 's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary.

IV

Having clarified the Title VII undue-hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance. The Third Circuit assumed that *Hardison* prescribed a "more than a de minimis cost" test, 35 F.4th at 175, and this may have led the court to dismiss a number of possible accommodations, including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of employees. Without foreclosing the possibility that USPS will prevail, we think it appropriate to leave it to the lower courts to apply our clarified context-specific standard, and to decide whether any further factual development is needed.

* * *

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOTOMAYOR, with whom Justice JACKSON joins, concurring.

***474** As both parties here agree, the phrase "more than a *de minimis* cost" from *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), was loose language. An employer violates Title VII if it fails "to reasonably accommodate" an employee's religious observance or practice, unless the employer demonstrates that accommodation would result in "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The statutory standard is "undue hardship," not trivial cost.

*Hardison*, however, cannot be reduced to its "*de minimis*" language. Instead, that case must be understood in light of its facts and the Court's reasoning. The *Hardison* Court concluded that the plaintiff 's proposed accommodation would have imposed an undue hardship on the conduct of the employer's business because the accommodation would have required the employer either to deprive other employees of their seniority rights under a collective-bargaining agreement, or to incur substantial additional costs in the form of lost efficiency or higher wages. 432 U.S. at 79–81, 83–84, and n. 14, 97 S.Ct. 2264. The Equal Employment Opportunity Commission has interpreted Title VII's undue-hardship standard in this way for seven consecutive Presidential administrations, from President Reagan to President Biden. See 29 C.F.R. § 1605.2(e) (2022) (citing *Hardison*, 432 U.S. at 80, 84, 97 S.Ct. 2264).

Petitioner Gerald Groff asks this Court to overrule *Hardison* and to replace it with a "significant difficulty or expense" standard. Brief for Petitioner 17–38. The Court does not do so. That is a wise choice because *stare decisis* has "enhanced force" in statutory cases. *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 456, 135 S.Ct. 2401, 192 L.Ed.2d 463 (2015). Congress is free to revise this Court's statutory interpretations. The Court's respect for Congress's decision not to intervene promotes the separation of powers by requiring interested parties to resort to the legislative rather than the judicial process ***475** to achieve their policy goals. This justification for statutory *stare decisis* is especially ****2298** strong here because "Congress has spurned multiple opportunities to reverse [*Hardison*]—openings as frequent and clear as this Court ever sees." *Id.*, at 456–457, 135 S.Ct. 2401.[1] Moreover, in the decades since *Hardison* was decided, Congress has revised Title VII multiple times in response to other decisions of this Court,[2] yet never in response to *Hardison*. See *Kimble*, 576 U.S. at 457, 135 S.Ct. 2401.

Groff also asks the Court to decide that Title VII requires the United States Postal Service to show "undue hardship to [its] *business*," not to Groff 's co-workers. Brief for Petitioner 42 (emphasis added); see 35 F.4th 162, 176 (C.A.3 2022) (Hardiman, J., dissenting). The Court, however, recognizes that Title VII requires "undue hardship on the *conduct* of the employer's business." 42 U.S.C. § 2000e(j) (emphasis added). Because the "conduct of [a] business" plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees. See, *e.g.*, *Hardison*, 432 U.S. at 79–81, 97 S.Ct. 2264 (deprivation of employees' bargained-for seniority rights constitutes undue hardship). There is no basis in the text of the statute, let alone in economics ***476** or common sense, to conclude otherwise. Indeed, for many businesses, labor is more important to the conduct of the business than any other factor.

To be sure, some effects on co-workers will not constitute "undue hardship" under Title VII. For example, animus toward a protected group is not a cognizable "hardship" under any antidiscrimination statute. Cf. *ante*, at 2296 – 2297. In addition, some hardships, such as the labor costs of coordinating voluntary shift swaps, are not "undue" because they are too insubstantial. See 29 C.F.R. §§ 1605.2(d)(1)(i), (e)(1). Nevertheless, if there is an undue hardship on "the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

conduct of the employer's business," 42 U.S.C. § 2000e(j), then such hardship is sufficient, even if it consists of hardship on employees. With these observations, I join the opinion of the Court.

**All Citations**

600 U.S. 447, 143 S.Ct. 2279, 216 L.Ed.2d 1041, 2023 Daily Journal D.A.R. 6393, 29 Fla. L. Weekly Fed. S 1117

Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1 Other employees complained about the consequences of Groff 's absences. While the parties dispute some of the details, it appears uncontested that at least one employee filed a grievance asserting a conflict with his contractual rights. After disputing any conflict with contract rights, USPS eventually settled that claim, with the settlement reaffirming USPS's commitment to the Memorandum of Understanding. App. 118, 125–126.

2 Groff represents that his resignation was in light of expected termination, and the District Court found "a genuine issue of material fact" foreclosed summary judgment as to whether Groff suffered an adverse employment action. 2021 WL 1264030, *8 (ED Pa., Apr. 6, 2021). The Government does not dispute the point in this Court.

3 See, *e.g.*, EEOC Dec. No. 71–779, 1970 WL 3550, *2 (Dec. 21, 1970) (no undue hardship in permitting nurse to wear religious headscarf).

4 See EEOC Dec. No. 71–463, 1970 WL 3544, *1–*2 (Nov. 13, 1970) (no "undue hardship" or "unreasonable burde[n]" for employer to train co-worker to cover two-week religious absence); EEOC Dec. No. 70–580, 1970 WL 3513, *1–*2 (Mar. 2, 1970) (manufacturing employer asked to accommodate sundown-to-sundown Sabbath observance did not carry "burden ... to demonstrate undue hardship" where it did not address "whether another employee could be trained to substitute for the Charging Party during Sabbath days, or whether already qualified personnel ha[d] been invited to work a double shift"); EEOC Dec. No. 70–670, 1970 WL 3518, *2 (Mar. 30, 1970) (no "undue 'hardship' " in having other employees take on a few more on-call Saturdays per year); see also EEOC Dec. No. 70–110, 1969 WL 2908, *1–*2 (Aug. 27, 1969) (employer could not deny employee all Sunday "overtime opportunities" on basis of employee's religious inability to work Saturday, where others not working the full weekend had been accommodated, notwithstanding employer's claim of "considerable expense"); EEOC Dec. No. 70–99, 1969 WL 2905, *1 (Aug. 27, 1969) (no obligation to accommodate seasonal employee unavailable for Saturday work, where employer showed both "no available pool of qualified employees" to substitute and a "practical impossibility of obtaining and training an employee" to cover one day a week for six weeks).

5 "Labor organization[s]" themselves were and are bound by Title VII's nondiscrimination rules. 42 U.S.C. § 2000e–2(c) (1964 ed.).

6 See Pet. for Cert. in *Trans World Airlines, Inc.* v. *Hardison*, O. T. 1975, No. 75–1126, pp. 2–3, 17–22.

7 See *Kennedy* v. *Bremerton School Dist.*, 597 U. S. ––––, ––––, 142 S.Ct. 2407, 2427, 213 L.Ed.2d 755 (2022).

8 See, *e.g.*, Brief for Chrysler Corporation as *Amicus Curiae* 6–20 (arguing an Establishment Clause violation), and Brief for State of Michigan as *Amicus Curiae* 20–25 (arguing no conflict with the Establishment Clause), in *Trans World Airlines, Inc.* v. *Hardison*, O. T. 1976, No. 75–1126 etc.

9 The background summarized above and the patent clash between the ordinary meaning of "undue hardship" and "more than ... de minimis" led some to interpret the decision to rest on Establishment Clause concerns. Justice Marshall observed in his *Hardison* dissent that the majority opinion "ha[d] the singular advantage of making consideration of petitioners' constitutional challenge unnecessary." 432 U.S. at 89, 97 S.Ct. 2264. A few courts assumed that *Hardison* actually was an Establishment Clause decision. See, *e.g.*, *Gibson v. Missouri Pacific R.*, 620 F.Supp. 85, 88–89 (ED Ark. 1985) (concluding that requiring an employer to "incur greater than de minimis costs" related to accommodating a Sabbath

"would therefore violate the establishment clause"); see also *Massachusetts Bay Transp. Auth. v. Massachusetts Comm'n Against Discrimination*, 450 Mass. 327, 340–341, and n. 15, 879 N.E.2d 36, 46–48, and n.15 (2008) (construing state law narrowly on premise that *Hardison* might state outer constitutional bounds). Some constitutional scholars also suggested that *Hardison* must have been based on constitutional avoidance. See, *e.g.*, P. Karlan & G. Rutherglen, Disabilities, Discrimination, and Reasonable Accommodation, 46 Duke L. J. 1, 6–7 (1996); M. McConnell, Accommodation of Religion: An Update and a Response to the Critics, 60 Geo. Wash. L. Rev. 685, 704 (1992); cf. *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 829 (C.A.6 2020) (Thapar, J., concurring). In doing so, some have pointed to *Hardison*'s passing reference to a need to avoid "unequal treatment of employees on the basis of their religion." 432 U.S. at 84, 97 S.Ct. 2264. But the Court later clarified that "Title VII does not demand mere neutrality with regard to religious practices" but instead "gives them favored treatment" in order to ensure religious persons' full participation in the workforce. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, 135 S.Ct. 2028, 192 L.Ed.2d 35 (2015).

10 We do not understand Groff to challenge the continued vitality of *Hardison*'s core holding on its "principal issue" (bracketing his disputes that the memorandum of understanding set forth a seniority system). 432 U.S. at 83, and n. 14, 97 S.Ct. 2264.

11 The dissent appears to have drawn its estimate from Hardison's daily rate at the time of termination ($3.37/hour) and deposition testimony on typical overtime rates and shift lengths. See App. in No. 75–1126 etc., at pp. 40, 126.

12 For example, two years ago, the Seventh Circuit told the EEOC that it would be an undue hardship on Wal-Mart (the Nation's largest private employer, with annual profits of over $11 billion) to be required to facilitate voluntary shift-trading to accommodate a prospective assistant manager's observance of the Sabbath. *EEOC v. Walmart Stores East, L. P.*, 992 F.3d 656, 659–660 (2021). See Walmart Inc., Wall Street Journal Markets (June 4, 2023).

13 See, *e.g.*, *Wagner v. Saint Joseph's/Candler Health System, Inc.*, 2022 WL 905551, *4–*5 (SD Ga., Mar. 28, 2022) (Orthodox Jew fired for taking off for High Holy Days); *Camara v. Epps Air Serv., Inc.*, 292 F.Supp.3d 1314, 1322, 1331–1332 (ND Ga., 2017) (Muslim woman who wore a hijab fired because the sight of her might harm the business in light of "negative stereotypes and perceptions about Muslims"); *El-Amin v. First Transit, Inc.*, 2005 WL 1118175, *7–*8 (SD Ohio, May 11, 2005) (Muslim employee terminated where religious services conflicted with "two hours" of training a week during a month of daily training); *EEOC v. Sambo's of Ga., Inc.*, 530 F.Supp. 86, 91 (ND Ga., 1981) (hiring a Sikh man as a restaurant manager would be an undue hardship because his beard would have conflicted with "customer preference").

14 At the certiorari stage, the Government argued against review by noting that Government employees receive "at least as much protection for religious-accommodation claims [under the Religious Freedom Restoration Act (RFRA)] as [under] any interpretation of Title VII." Brief in Opposition 9. Courts have not always agreed on how RFRA's cause of action—which does not rely on employment status—interacts with Title VII's cause of action, and the Third Circuit has treated Title VII as exclusively governing at least some employment-related claims brought by Government employees. Compare *Francis v. Mineta*, 505 F.3d 266, 271 (C.A.3 2007), with *Tagore v. United States*, 735 F.3d 324, 330–331 (C.A.5 2013) (federal employee's RFRA claim could proceed even though *de minimis* standard foreclosed Title VII claim). Because Groff did not bring a RFRA claim, we need not resolve today whether the Government is correct that RFRA claims arising out of federal employment are not displaced by Title VII.

15 In addition to suggesting that *Hardison* be revisited, some Justices have questioned whether *Hardison* (which addresses the pre-1972 EEOC Guidelines) binds courts interpreting the current version of Title VII. See *Abercrombie*, 575 U.S. at 787, n. *, 135 S.Ct. 2028 (THOMAS, J., concurring in part and dissenting in part). As explained below, because we—like the Solicitor General—construe *Hardison* as consistent with the ordinary meaning of "undue hardship," we need not reconcile any divergence between *Hardison* and the statutory text.

1 See, *e.g.*, H. R. 1440, 117th Cong., 1st Sess., § 4(a)(4) (2021); H. R. 5331, 116th Cong., 1st Sess., § 4(a)(4) (2019); S. 3686, 112th Cong., 2d Sess., § 4(a)(3) (2012); S. 4046, 111th Cong., 2d Sess., § 4(a)(3) (2010); S. 3628, 110th Cong., 2d Sess., § 2(a)(1)(B) (2008); H. R. 1431, 110th Cong., 1st Sess., § 2(a)(4) (2007); H. R. 1445, 109th Cong., 1st Sess., § 2(a)(4) (2005); S. 677, 109th Cong., 1st Sess., § 2(a)(4) (2005); S. 893, 108th Cong., 1st Sess., § 2(a)(4) (2003); S. 2572, 107th Cong., 2d Sess., § 2(a)(4) (2002); H. R. 4237, 106th Cong., 2d Sess., § 2(a)(4) (2000); S. 1668, 106th Cong., 1st

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

Sess., § 2(a)(4) (1999); H. R. 2948, 105th Cong., 1st Sess., § 2(a)(4) (1997); S. 1124, 105th Cong., 1st Sess., § 2(a)(4) (1997); S. 92, 105th Cong., 1st Sess., § 2(a)(3) (1997); H. R. 4117, 104th Cong., 2d Sess., § 2(a)(3) (1996).

2 See Civil Rights Act of 1991, 105 Stat. 1071 (overruling *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)); Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5 (overruling *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007)).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.